**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| **CARTER DAVIES,** on behalf of himself and all others similarly situated,<br><br>Plaintiff,<br><br>**v.**<br><br>**CLEANCHOICE ENERGY, INC.,**<br><br>Defendant. | Civil Case No.: 26 Civ. 3967<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

# TABLE OF CONTENTS


NATURE OF THE CASE ..... 1

PARTIES ..... 3

JURISDICTION AND VENUE ..... 4

- I. Subject Matter Jurisdiction ..... 4
- II. Personal Jurisdiction ..... 4
- III. Venue ..... 4

FACTUAL ALLEGATIONS ..... 5

- I. The History Of Deregulation And ARES' Role In Energy Markets ..... 5
- II. CleanChoice Exploits Its Customers ..... 6
- III. Plaintiff Davies's Dealings With CleanChoice Are Typical ..... 7
- IV. CleanChoice Violated Illinois Alternative Retail Electric Supplier Selection Law ..... 25
- V. CleanChoice's Documented History Of CleanChoice's Deceptive Business Practices ... 26

TOLLING OF STATUTE OF LIMITATIONS ..... 29

CLASS ALLEGATIONS ..... 30

CAUSES OF ACTION ..... 33

COUNT I (Breach of Contract) ..... 33

COUNT II (Illinois Consumer Fraud and Deceptive Practices Act) ..... 36

COUNT III (Unjust Enrichment) ..... 40

PRAYER FOR RELIEF ..... 41

JURY DEMAND ..... 42

Plaintiff Carter Davies ("Plaintiff"), by his attorneys, Finkelstein, Blankinship, Frei-Pearson & Garber, LLP and Wittels McInturff Palikovic, brings this proposed class action in his individual capacity, and on behalf of a class of consumers defined below, against Defendant CleanChoice Energy, Inc. (hereinafter "CleanChoice" or "Defendant") and hereby alleges the following with knowledge as to his own acts, and upon information and belief, as to all other acts:

## NATURE OF THE CASE

1. Defendant CleanChoice is an alternative retail energy supplier ("ARES") that sells residential and commercial electricity in Illinois's deregulated retail electricity market. This action seeks to redress CleanChoice's deceptive and bad faith pricing practices that have caused tens of thousands of residential and commercial customers in Illinois to pay considerably more for their electricity than they should have paid.

2. Defendant has taken advantage of the deregulation of Illinois's retail electricity market by misrepresenting how its electricity rates are calculated. Among other conduct challenged in this action, CleanChoice makes these false and deceptive claims in the customer contracts and enrollment materials CleanChoice provides to Illinois customers.

3. CleanChoice uniformly represents in its customer contract's variable price term that the variable electricity rate Illinois customers pay is "based on different factors which may include the cost for us to purchase renewable energy certificates (RECs), applicable state and local taxes, generation and transmission charges, and other marketing conditions."

4. CleanChoice's representation in its customer contract regarding how its variable electricity rate is determined is false and deceptive, and designed to take advantage of consumers' good faith and their lack of knowledge about, and access to, accurate information about the cost of RECs, taxes, generation and transmission charges, and wholesale market (or marketing)

conditions. In reality, CleanChoice did not provide its customers with prices based on these factors but instead used a pricing methodology that focused on maximizing profits.

5. CleanChoice abused the information asymmetry between it and its customers and omitted material information from its contract, FAQs, and enrollment form. For example, CleanChoice failed to adequately disclose or misleadingly disclosed (i) that CleanChoice's variable energy rates are consistently and significantly higher than the rates the customer's existing utility charges, (ii) that customers paying Defendant's variable rate receive no material added benefit in exchange for paying energy rates that are dramatically higher than the utility's rates, other than the minimal cost of additional RECs, (iii) CleanChoice's actual variable rate methodology that it uses to calculate a customer's monthly variable rate, (iv) that "the biggest factor determining the size of [customers'] bill is the amount of electricity they use" and "usage is almost always the biggest factor influencing electricity bills" without mentioning that CleanChoice's rates may be the biggest factor influencing a customer's bill, (v) the conditions that must be present for a variable rate customer to save money compared to what the customer's local utility would have charged, and (vi) that CleanChoice's costs to purchase RECs are minimal compared to its electricity procurement costs and that REC costs do not justify Defendant charging exorbitant rates.

6. As a result of this and the other deceptive, unlawful, and unauthorized acts described herein, tens of thousands of unsuspecting Illinois customers have been, and continue to be, fleeced by CleanChoice out of millions of dollars in exorbitant charges for electricity.

7. Defendant's scheme, which often affects society's most vulnerable citizens, is immoral, unethical, oppressive, and unscrupulous. Exorbitant energy prices have devastating consequences for families struggling to pay their monthly utility bills, housing costs, auto costs,

food, medicine, and other necessities. When there is not enough in the budget to meet these basic needs, families may face disconnection from vital utility service, inability to fully cover food and healthcare costs, and other changes that can harm the health, safety, and well-being of vulnerable families.

8. Plaintiff and other Illinois CleanChoice customers (the "Class") have been injured by Defendant's unlawful and unauthorized practices. Plaintiff and the Class therefore seek damages, restitution, statutory penalties, punitive damages, and declaratory and injunctive relief for CleanChoice's breach of contract, breach of the duty of good faith and fair dealing, violation of Illinois consumer protection law, and unjust enrichment.

9. Only through a class action can CleanChoice's customers remedy Defendant's ongoing wrongdoing. Because the monetary damages suffered by each customer are smaller than the much higher cost a single customer would incur in trying to litigate CleanChoice's unlawful practices, it makes no financial sense for an individual customer to bring his or her own lawsuit. Further, customers do not realize they are victims of CleanChoice's deceptive and unlawful conduct. With this class action, Plaintiff and the Class seek to level the playing field and make sure that companies like CleanChoice engage in fair and contractually-compliant business practices.

## PARTIES

10. Plaintiff Carter Davies resides in Chicago, Illinois. Plaintiff signed up with CleanChoice in June 2017, and he did so expecting to receive electricity at a reasonable price. Soon after switching to CleanChoice, Plaintiff Davies was charged an exorbitant monthly variable electricity rate. Plaintiff canceled his CleanChoice service in December 2025.

11. As a result of Defendant's deceptive and otherwise improper and unauthorized conduct, Plaintiff incurred excessive charges for electricity.

12. Defendant CleanChoice Energy, Inc. is a Maryland corporation headquartered at 1055 Thomas Jefferson St. NW, Washington, D.C. 20007. CleanChoice therefore resides in and is a citizen of Maryland and Washington, D.C.

## JURISDICTION AND VENUE

### I. Subject Matter Jurisdiction

13. This Court has jurisdiction over the claims asserted in this action pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d), because the aggregate claims of the Class exceed the sum or value of $5,000,000, the Class has more than 100 members, and diversity of citizenship exists between at least one member of the Class and Defendant. Plaintiff resides in and is a citizen of Illinois and CleanChoice resides in and is a citizen of Maryland and Washington, D.C.

### II. Personal Jurisdiction

14. This Court has specific personal jurisdiction over Defendant because Defendant purposefully directed its conduct into this jurisdiction by distributing and selling electricity to Plaintiff and other Illinois consumers, and Plaintiff's claims against Defendant arise from Defendant's conduct in Illinois.

15. CleanChoice has consented to personal jurisdiction in Illinois by putting a forum selection clause in its form contract with Plaintiff requiring litigation to occur within Illinois.

### III. Venue

16. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1). Substantial acts in furtherance of the alleged improper conduct occurred within this District. CleanChoice supplied electricity to Plaintiff's residence, which is located in Chicago, Illinois.

17. The contract between Plaintiff and CleanChoice has a venue provision requiring that lawsuits be filed in a court in Illinois.

## FACTUAL ALLEGATIONS

### I. The History Of Deregulation And ARES' Role In Energy Markets

18. In 1997, Illinois deregulated the sale of retail electricity. As a result of deregulation, Illinois consumers can purchase electricity through third-party suppliers while continuing to receive delivery of the energy from their existing public utilities. These third-party energy suppliers are known in Illinois as Alternative Retail Electric Suppliers ("ARES"). Since Illinois opened its retail electric markets to competition, more than 3 million Illinois consumers have switched to an ARES.

19. ARES, the new energy suppliers, compete primarily against local utilities. ARES purchase energy directly or indirectly from companies that produce energy. ARES then sell that energy to end-user customers. However, ARES do not deliver energy to customers' homes and businesses, and many do not produce electricity. Rather, the companies that produce energy deliver it to customers' utilities, which in turn deliver it to the customer. ARES merely buy electricity and then sell that energy to end-users with a mark-up. Thus, ARES are essentially brokers and traders: they neither produce nor deliver electricity but merely buy energy from a producer and re-sell it to customers. The local utility also continues to bill the customer for both the energy supply and delivery costs. The only difference to the customer is whether the utility or an ARES sets the price for the customer's energy supply.

20. ARES like CleanChoice can purchase wholesale energy and pay for the required charges using the exact same wholesale market as utilities. ARES like CleanChoice can also pay the exact same prices. But ARES such as CleanChoice have even more options to acquire energy than the utilities, including: owning energy production facilities; purchasing energy from wholesale marketers and brokers at the price available at or near the time it is used by the retail consumer; and purchasing energy in advance, such as by purchasing futures contracts for the

delivery of electricity in the future at a predetermined price. The fundamental purpose of deregulation is to allow ARES to use these and other innovative purchasing strategies to reduce wholesale energy acquisition costs and pass those savings on to customers.

21. ARES are subject to minimal regulation by Illinois's utility regulator, the Illinois Commerce Commission (the "ICC"). ARES like CleanChoice do not have to file their rates or the method by which those rates are set with the ICC. Likewise, ARES do not have to file or seek approval for the rates they charge or the methods by which they set their rates with the ICC. Instead, an ARES customer's rates are governed by the contract between the ARES and the customer (and the relevant consumer protection and contract laws).

22. After a customer switches to an ARES, the customer's energy supply charge, based on a customer's kilowatt hour ("kWh") usage, is calculated using the supply rate charged by the company and not the customer's former utility. The supply rate charged is itemized on the customer's bill as the number of kilowatt hours multiplied by the rate. For example, if a customer uses 800 kWh at a rate of $0.07 per kWh, the customer will be billed $56.00 (800 × $0.07) for their energy supply. This energy supply charge is exclusive of delivery charges and other fees charged by the local utility, which continues to deliver the energy even when a customer has enrolled with an ARES.

23. Customers who do not choose to switch to an ARES for their energy supply continue to receive their supply from their local utility, such as ComEd. In that circumstance, ComEd determines the energy supply charge as well as the delivery charge and any fees.

## II. CleanChoice Exploits Its Customers

24. Because of their increased flexibility, ARES like CleanChoice can offer rates competitive with—if not substantially lower than—the utilities' rates, and some do. Yet CleanChoice's variable rates are consistently and substantially higher than the local utility's rates

and wholly detached from the energy acquisition costs to which CleanChoice's contract ties those rates.

25. Instead, CleanChoice's rates are the result of unbridled price gouging and profiteering. CleanChoice does not have discretion under the contract to add whatever markup it chooses.

26. CleanChoice took advantage of deregulation and the lack of regulatory oversight to charge customers exorbitant rates. In theory, energy deregulation allows customers to take advantage of market-based rates that decline when wholesale costs decline. However, CleanChoice exploits deregulated markets by consistently charging its customers far more than its contractual pricing terms permit and by failing to adequately disclose how its rates are actually determined. Customers like Plaintiff have neither ready access to information regarding the market costs for energy supply nor the expertise to understand that data. CleanChoice can and does take advantage of this information asymmetry by charging excessive rates.

## III. Plaintiff Davies's Dealings With CleanChoice Are Typical

27. In or around June 2017, Plaintiff received a CleanChoice mailer, comprised of a "CLEAN ENERGY SIGN & SWITCH FORM," a marketing insert titled "Frequently Asked Questions About Switching to Clean Energy," the Disclosure Statement consisting of Terms and Conditions and Product Summary/Label, and a form letter addressed to "Illinois Resident." Attached hereto as Exhibit A is a copy of the mailer. Plaintiff Davies reviewed the mailer's contents and thereafter decided to sign up for CleanChoice.

28. The Clean Energy Sign & Switch Form contained a pre-checked checkbox with the following text next to it:

> I authorize CleanChoice Energy to enroll my address shown at left for 100% renewable energy. I understand that I may switch back at any time without penalty. I have reviewed and agree to the enclosed

> terms and conditions, and I authorize CleanChoice Energy to perform the necessary tasks to complete my request.

Plaintiff filled out his ComEd account number and email address, dated and signed the Clean Energy Sign & Switch form, and mailed the Sign & Switch form to CleanChoice.

29. The Terms and Conditions enclosed in the mailer make clear that:

> This Disclosure Statement (Terms and Conditions and Product Summary/ Label) along with your enrollment authorization or renewal letter constitutes your entire Agreement between you and CleanChoice Energy with regard to your purchase of electric generation and other related services from CleanChoice Energy.

CleanChoice's form Terms and Conditions do not incorporate any other documents by reference or express an intent to make any separate, future terms a part of the contract. No reasonable person would understand that, by signing CleanChoice's authorization form, they would be agreeing to any contract terms beyond the Terms and Conditions enclosed in the mailer together with the Clean Energy Sign & Switch form.

30. After Plaintiff enrolled in June 2017, CleanChoice began supplying electricity to Plaintiff Davies's residence at a variable rate and it continued to do so until November 2025.

31. The Terms and Conditions included in the mailer contained the following pricing term:

> Pricing: You will receive a variable supply rate with a three-billing cycle introductory rate guarantee. Thereafter, you will be charged a variable supply rate that is subject to change based on different factors which may include the cost for us to purchase renewable energy certificates (RECs), applicable state and local taxes, generation and transmission charges, and other marketing conditions. The variable supply rate may be different, including higher, than your utility's supply rate.

32. The term "based on" provides exclusivity and precludes CleanChoice's rate-setting discretion such that monthly fluctuations in its variable electricity rates can be determined solely

by "the cost for [CleanChoice] to purchase renewable energy certificates (RECs)," "applicable state and local taxes," "generation and transmission charges," and "other marketing conditions."

33. Reasonable consumers understand that when you make a calculation "based on" specific factors, you take only those factors into account; the calculation is made "relying on" or "building on" those factors. For example, you calculate a baseball player's batting average "based on" that player's number of hits and number of at bats—nothing more and nothing less. The area of a rectangle is calculated "based on" its width and length, while velocity is calculated "based on" distance and time. Here, CleanChoice's use of the term "based on" limits the variation in the variable rates to be determined solely by the cost components listed in CleanChoice's Terms and Conditions. An assessment of those costs, however, shows that CleanChoice did not base customers' variable rates on those inputs and instead added exorbitant and fluctuating markups.

34. "Marketing conditions" appears to be a scrivener's error; it should be read "market conditions." This reading is consistent with CleanChoice's practices and industry convention.

35. For example, after Plaintiff enrolled, CleanChoice sent him a document that purports to provide the terms and conditions of his agreement (which it did not because the agreement between Plaintiff and CleanChoice was included with the original mailer). That document, entitled "Illinois Small Commercial and Residential Terms and Conditions," contains the same pricing term but uses "market conditions" instead of "marketing conditions."

36. This also matches CleanChoice's contracts in other states. Another pending class action lawsuit against CleanChoice reveals that its Massachusetts contracts likewise use the term "market conditions" rather than "marketing conditions." *See* Dkt. 18-1 at 3, *Ware v. CleanChoice Energy, Inc.*, No. 25 Civ. 13623 (D. Mass.).

37. Indeed, if a customer goes to CleanChoice's website today and searches for its offerings in Chicago, the terms provide that the variable rate would be based on "market conditions" rather than "marketing conditions."[1]

38. In light of CleanChoice's representations in its form contract, any reasonable consumer, including Plaintiff, would reasonably expect that CleanChoice's variable rates "based on" its "cost [] to purchase renewable energy certificates (RECs)," "applicable state and local taxes," "generation and transmission charges," and "other market[] conditions" and would reflect CleanChoice's actual costs plus a reasonable margin.

39. Unfortunately, CleanChoice did not charge variable rates based on its costs and a reasonable margin. Instead, CleanChoice charged its customers variable rates that were untethered from its costs to maximize its own profits.

40. CleanChoice justifies its price gouging by claiming its procurement of energy "do[es] not contribute to carbon dioxide or air pollution." Ex. A at 3 (FAQs). That, too, is a misrepresentation.

41. Rather than producing renewable energy or procuring energy from renewable energy producers, CleanChoice simply purchases renewable energy credits ("RECs") that represent the production by another entity of wind and solar energy in the form of RECs. CleanChoice then charges its customers for these RECs. For this reason, the Attorney General of Illinois has stated that ARES "cannot truthfully claim that they are providing electricity generated from renewable resources" when relying on RECs as the basis for that claim.[2]

---

[1] https://customers.cleanchoiceenergy.com/plans/Disclosure/COMED12MOWORLDMAR26 (last visited April 9, 2026).

[2] First Notice Order, Case 15-0512, ILLINOIS COMMERCE COMM'N (Sep. 22, 2016), at 109, https://icc.illinois.gov/docket/P2015-0512/documents/246300/files/434628.pdf

42. Further, CleanChoice's costs associated with purchasing RECs are minimal compared to the cost of procuring electricity in wholesale markets, and RECs costs cannot explain CleanChoice's exorbitant rates. Indeed, in 2024 in the PJM Interconnection, which operates the grid for the ComEd territory in Illinois, RECs were priced at less than 4 cents per kWh.[3] CleanChoice charged consumers far more for their supposedly 100% renewable-based electricity than provided for in the pricing term of CleanChoice's contract.

43. Other than possibly a desire to promote or use renewable energy, price is the most important consideration for potential CleanChoice energy consumers. Given that there is no difference at all in the electricity that ARES supply as opposed to the consumer's local utility, the only reason a consumer would switch to CleanChoice is for the potential savings offered in a competitive market as opposed to prices offered by a regulated utility, plus a willingness to pay the costs of RECs.

44. Pursuant to CleanChoice's Terms and Conditions included with the mailer, which is included in Exhibit A, Plaintiff Davies received a guaranteed introductory rate of 8.7 cents per kilowatt hour for his first three months of service. After that guaranteed introductory rate expired, CleanChoice increased Plaintiff Davies's electricity rate substantially.

45. A comparison of CleanChoice's rates to prevailing market costs, including the cost to procure RECs (for December 2024 – November 2025), demonstrates that CleanChoice does not charge a rate based on the factors it promised.

46. The table below, *see* ¶ 49, identifies (i) the billing periods during which Plaintiff was enrolled in CleanChoice's variable rate for electricity services, (ii) the variable rate

---

[3] U.S. State Electricity Resource Standards: 2025 Data Update, Lawrence Berkeley National Laboratory (August 2025), at 4, https://emp.lbl.gov/sites/default/files/2025-08/State Electricity Resource Standards-2025 Data Update.pdf

CleanChoice charged Plaintiff, (iii) the corresponding "Market Supply Costs," which accounts for the cost of RECs, and (iv) the differences between CleanChoice's rates and the contemporaneous Market Supply Costs ("CleanChoice's Multiplier").

47. The Market Supply Costs below are based on the costs that ARES like CleanChoice incur supplying a retail customer in Plaintiff's utility areas for each period, including the cost to procure RECs paired with one hundred percent of the electricity sold to that customer. The Market Supply Costs include the weighted average of the hourly day-ahead PJM prices in Plaintiff's utility zone, weighted by the metered load in the ComEd service territory, along with ancillary services costs, capacity costs, RECs, and various relatively small charges related to the PJM (all the same costs that CleanChoice identifies in its contract with Plaintiff). These charges are tracked by PJM's Data Miner, the program that allows users to download data sets in the PJM for hourly metered loads, hourly day-ahead prices, and hourly ancillary service prices.

48. The Market Supply Costs therefore represent the costs and market conditions that determine the costs that CleanChoice and other ARES incur in providing energy to retail customers. It reflects the costs that CleanChoice's competitors in deregulated markets incur. That CleanChoice's rates are so vastly different from the Market Supply Costs demonstrates that CleanChoice's rates are not "based on" its actual costs as required by CleanChoice's contract.

49. The following table represents Plaintiff Davies's CleanChoice rates versus the Market Supply costs. The Market Supply Costs include the cost of purchasing RECs.

| Billing Period | CleanChoice Rate (Cents Per kWh) | Market Supply Costs (Cents per kWh) | Overcharge Factor | Overcharge Percentage |
|---|---|---|---|---|
| December 2024 | 19.0 | 8.5 | 2.22x | 122% |
| January 2025 | 19.0 | 11.0 | 1.73x | 73% |
| February 2025 | 19.0 | 10.3 | 1.85x | 85% |
| March 2025 | 19.0 | 9.6 | 1.97x | 97% |
| April 2025 | 19.0 | 9.7 | 1.95x | 95% |
| May 2025 | 19.0 | 9.8 | 1.93x | 93% |
| June 2025 | 19.0 | 14.5 | 1.31x | 31% |
| July 2025 | 19.0 | 16.3 | 1.16x | 16% |
| August 2025 | 19.0 | 12.9 | 1.48x | 48% |
| September 2025 | 19.0 | 13.0 | 1.46x | 46% |
| October 2025 | 19.0 | 12.9 | 1.47x | 47% |
| November 2025 | 19.0 | 12.5 | 1.52x | 52% |

50. As the above tables show, CleanChoice's variable rates are consistently and substantially higher than a rate based on the market supply costs, which further demonstrates that CleanChoice's rates are not set in accordance with its costs.

51. Plaintiff Davies's CleanChoice rates are higher than the Market Supply Costs for ***every month*** Plaintiff has data and are on average an overcharge of 1.67 times (67% overcharge) the Market Supply Costs.

52. The rates CleanChoice charged Plaintiff Davies likewise fail to fluctuate in accordance with Market Supply Costs. For instance, when the Market Supply Costs declined from 16.3 cents per kWh to 12.5 cents per kWh between July 2025 and November 2025 (declining 23%), CleanChoice's variable rate did not change.

53. The cost of wholesale electricity is the primary component of the non-overhead costs CleanChoice incurs. As explained above, the other cost factors that may affect its variable

rate (such as capacity, ancillaries, transmission costs, transportation costs, and line losses) are included in the Market Supply Costs as well. These additional wholesale costs are relatively insignificant in terms of the overall costs Defendant incurs to provide retail electricity, and do not substantially fluctuate over time. Moreover, other ARES incur these costs as well, yet they offer substantially lower rates. Nor does the cost of purchasing RECs corresponding to 100% of Plaintiff's electricity supply explain CleanChoice's exorbitant rates.

54. Therefore, Defendant's non-overhead cost factors cannot explain Defendant's egregiously high variable rate or the reason its rates are disconnected from changes in wholesale costs. CleanChoice's overhead costs (which are relatively minor compared to electricity costs) also cannot explain the high variable rates charged, as CleanChoice's own fixed rates, which are significantly lower than its variable rates, demonstrate.

55. Indeed, CleanChoice routinely charges its customers variable rates for electricity that are among the highest offered by ARES in Illinois. The U.S. Energy Information Administration aggregates sales data for ARES on a statewide basis.[4] That compilation of data tells a story of CleanChoice continually overcharging its Illinois customers, even in comparison to other ARES.

56. For example, when aggregating the data for 2017–2024 (the date Plaintiff enrolled through the latest available data), it is clear CleanChoice charged significantly more than average. Aggregating the data and computing each ARES's weighted average rate for 2017–2024 (total revenue divided by total electricity sold), and then averaging those rates across all 81 ARES mentioned in the EIA data, yields a market average of 10.247 cents per kWh. CleanChoice, on the

[4] *See* Electric Sales, Revenue, and Average Price, U.S. Energy Information Administration, Table 12, https://www.eia.gov/electricity/sales_revenue_price/ (last visited April 9, 2026).

other hand, charged an average of 13.409 cents per kWh. That means that over the period Plaintiff was a customer, CleanChoice's average rate was 31% higher than average among ARES.

57. These overcharges allowed CleanChoice to extract substantial revenue from unsuspecting customers. Because CleanChoice sold significant amounts of electricity, these overcharges allowed CleanChoice to extract an additional $31.5 million from Illinois customers compared to if it charged the average rate other ARES were charging.[5] Its total revenue over the period was $133,389,700 just from its Illinois customers. Indeed, over this period, CleanChoice had the tenth highest rate among 81 ARES.

58. CleanChoice's price gouging is even more apparent when comparing among the major players in Illinois. Among the 33 ARES that sold more than 500,000 megawatt-hours in Illinois over the 2017–2024 time period, CleanChoice has the ***second highest*** weighted average rate. Among this subset of ARES in Illinois, the average rate was 9.714 cents per kWh, whereas CleanChoice's was 13.409 cents per kWh. This places CleanChoice at 38% above the average rate for the major players in the state.

59. It is therefore no surprise that in 2017, the year Plaintiff enrolled, CleanChoice had the fourth highest average rate in the state among 58 ARES.

60. Comparing CleanChoice to utility rates tells the same story.

61. The publicly available data on the local utilities' energy procurement costs (like ComEd, the utility serving Plaintiff's residence), serve as an ideal source of the wholesale cost of energy and the other applicable market-based costs because the utilities pay these costs, which are the same costs ARES like CleanChoice incur.

[5] This was calculated by the following formula: CleanChoice's revenue minus (the volume of electricity CleanChoice sold multiplied by the weighted average rate among ARES).

62. Not only are local utilities CleanChoice's primary competitors (as utilities always are), but ComEd procurement costs are the best indicator of market-based costs. Illinois utilities' procurement costs track the competitive public market for wholesale electricity and associated market costs (*i.e.*, ancillary services, installed capacity, and transmission—the same costs ARES such as CleanChoice incur) because they purchase wholesale electricity for their customers on an open free market and pass those costs onto consumers. *See* 220 ILCS § 5/16-111.5(l). CleanChoice incurred the same (if not lower) costs plus the cost of RECs.

63. To the extent CleanChoice procures its wholesale energy supply materially in advance of Plaintiff's utility, such advance purchases cannot explain CleanChoice's persistently high rates. While electricity bought further in advance might not exactly match the prices utilities pay, over time those costs should be commensurate as they are both based on market forces.

64. Consequently, the public data on local utilities' electricity supply costs are a reliable proxy for CleanChoice's market costs because local utilities are CleanChoice's primary competitor and the utilities' costs represent wholesale market prices for electricity and associated costs (even when accounting for REC costs).

65. In fact, CleanChoice has a tactical advantage over the utilities as it can (and does) combine wholesale purchasing with additional financial products. For example, in a January 9, 2018 interview, CleanChoice's CEO Tom Matzzie stated "[w]e're a member of the wholesale energy markets" including "the wholesale power markets, the PJM and New York ISO and ISO New England and MISO."[6] The CEO continued, "we transact there with the suppliers" and "we have trading relationships with wholesale energy suppliers, generators, and investment banks who

[6] Experts Only Podcast, *Interview with CleanChoice CEO Tom Matzzie*, *available at* https://cleancapital.com/resources/episode-14-tom-matzzie/ (last visited April 9, 2026).

provide financial derivatives."[7] The CEO also made clear that CleanChoice's wholesale "procurement" is "actually the least exciting and interesting part of our business. It doesn't move very fast and that's good. We're not speculators."[8]

66. Accordingly, CleanChoice's costs for purchasing energy should at the very least reflect (if not undercut) market prices, albeit over a longer term. Therefore, while the utility's procurement costs might not precisely match Defendant's actual costs (which are not available absent discovery), the latter's costs should correlate with the utility's costs and over time should be roughly similar (even when accounting for REC costs). Instead, CleanChoice's exorbitant rates when compared to CleanChoice's supply costs demonstrate that CleanChoice's rates were not "based on" its costs as required by its customer contract.

67. The following table compares Plaintiff Davies's variable electricity supply rates from CleanChoice for the 12 billing periods accessible to Plaintiff from December 2024 to November 2025 to his local utility ComEd's contemporaneous electricity supply costs.

---

[7] *Id.*

[8] *Id.*

| **Billing Period** | **CleanChoice Rate (Cents Per kWh)** | **ComEd's Supply Costs (Cents per kWh)** | **Overcharge Factor** | **Overcharge Percentage** |
|---|---|---|---|---|
| December 2024 | 19.0 | 5.7 | 3.36x | 236% |
| January 2025 | 19.0 | 6.0 | 3.16x | 216% |
| February 2025 | 19.0 | 6.5 | 2.94x | 194% |
| March 2025 | 19.0 | 6.6 | 2.89x | 189% |
| April 2025 | 19.0 | 6.2 | 3.06x | 206% |
| May 2025 | 19.0 | 8.5 | 2.23x | 123% |
| June 2025 | 19.0 | 10.6 | 1.80x | 80% |
| July 2025 | 19.0 | 9.6 | 1.98x | 98% |
| August 2025 | 19.0 | 10.0 | 1.90x | 90% |
| September 2025 | 19.0 | 10.0 | 1.89x | 89% |
| October 2025 | 19.0 | 8.2 | 2.31x | 131% |
| November 2025 | 19.0 | 8.0 | 2.38x | 138% |

68. The "Overcharge Percentage" column demonstrates the drastic difference between CleanChoice's rates for Plaintiff's account and ComEd's contemporaneous supply costs. The "Overcharge Factor" column demonstrates the factor at which CleanChoice overcharged Plaintiff compared to the reasonable benchmark of ComEd's supply costs. CleanChoice's rates were more than double ComEd's supply costs for 8 of the 12 billing periods and were more than ***triple*** ComEd's supply costs for 3 of the 12 billing periods. On average, CleanChoice's rates were 2.5 times (150% overcharge) ComEd's supply costs.

69. Given CleanChoice's variable pricing term, ComEd's electric supply costs are a reasonable, pre-discovery benchmark of CleanChoice's supply costs. As explained above, ComEd is CleanChoice's primary competitor in Plaintiff's service territory, and its supply costs encompass the average wholesale price of electricity and associated costs over time (the same costs that ARES

like CleanChoice incur) without any markup, making the utility's procurement costs an ideal comparator.

70. The disconnect between ComEd's costs and CleanChoice's rates further demonstrates that CleanChoice's rates did not even remotely reflect CleanChoice's costs. For Plaintiff Davies, between September 2025 and November 2025, ComEd's supply costs decreased by 20%, yet CleanChoice's rates remained the same.

71. Indeed, CleanChoice's rates debunk the notion that Plaintiff was being charged a "variable" rate that was based on CleanChoice's costs. Instead, CleanChoice found the ceiling price it could charge without customers noticing and held it steady. Despite changes in costs and market conditions, CleanChoice did not once change its "variable" rate for the entire 12 months for which Plaintiff has billing data. By failing to vary its rate according to its costs, CleanChoice deprived Plaintiff of the benefit of his bargain. Instead, CleanChoice acted as if Plaintiff had agreed to an inflated fixed rate contract and did not give Plaintiff the benefit of falling costs.

72. CleanChoice did not adequately disclose to Plaintiff that its variable electricity rates are consistently and significantly higher than the rates ComEd charges. CleanChoice likewise failed to adequately disclose to Plaintiff that, in paying Defendant's variable energy rates, Plaintiff received no added material benefit at a dramatically higher price than if he had bought his energy from ComEd (even accounting for REC costs).

73. No reasonable customer, including Plaintiff, would expect an ARES variable rate to be artificially inflated beyond any resemblance to the local utility's costs. Indeed, the fact that CleanChoice's rates were ***frequently*** double or triple the local utility's rates demonstrates the extent of its unscrupulous price gouging.

74. CleanChoice knew that its variable rates were consistently and significantly higher than the local utility's rates.

75. Defendant's failure to disclose this fact was a material omission and was materially misleading because the most important consideration for any consumer choosing an energy supplier is price; energy is a fungible commodity.

76. Moreover, Defendant at no time informed Plaintiff that the cost for electricity would be ***continuously significantly*** higher than the same electricity sold by ComEd, even when accounting for the RECs CleanChoice paired with a customer's usage.

77. CleanChoice lulled consumers into purchasing its energy supply via material omissions about its variable energy rates. Defendant did so to reap excessive profits at the expense of unsuspecting consumers. Defendant acted with actual malice, or wanton and willful disregard, for consumers' well-being.

78. Indeed, even accounting for RECs, CleanChoice's rates were still exorbitant when compared to the utility. The below table adds 4 cents per kWh to the utility's rates to account for the cost of RECs. However, this necessarily overestimates the utility's rates because the utility mix of energy already incorporates some level of renewables. Therefore, to reach the 100% offset that CleanChoice markets, the utility would not have to purchase RECs corresponding to 100% of the customer's usage. Instead, it would only need to purchase RECs to cover the utility's percentage of non-renewable energy. Therefore, the below table underestimates CleanChoice's egregious overcharges.

| Billing Period | CleanChoice Rate (Cents Per kWh) | ComEd's Supply Costs Plus RECs (Cents per kWh) | Overcharge Factor | Overcharge Percentage |
|---|---|---|---|---|
| December 2024 | 19.0 | 9.7 | 1.96x | 96% |
| January 2025 | 19.0 | 10.0 | 1.90x | 90% |
| February 2025 | 19.0 | 10.5 | 1.81x | 81% |
| March 2025 | 19.0 | 10.6 | 1.79x | 79% |
| April 2025 | 19.0 | 10.2 | 1.86x | 86% |
| May 2025 | 19.0 | 12.5 | 1.52x | 52% |
| June 2025 | 19.0 | 14.6 | 1.30x | 30% |
| July 2025 | 19.0 | 13.6 | 1.40x | 40% |
| August 2025 | 19.0 | 14.0 | 1.36x | 36% |
| September 2025 | 19.0 | 14.0 | 1.36x | 36% |
| October 2025 | 19.0 | 12.2 | 1.56x | 56% |
| November 2025 | 19.0 | 12.0 | 1.58x | 58% |

79. As shown above, even this overly conservative metric establishes that CleanChoice overcharged Plaintiff for ***every month*** for which he had billing data.

80. Accordingly, these four benchmarks (Market Supply Costs, the rates of other ARES, utility rates, and CleanChoice's own fixed rates) demonstrate that CleanChoice's rates were not based on its costs for RECs, taxes, generation and transmission, and "market[] conditions" as required under the contract.

81. Moreover, even if the Court were to construe the contract using the "marketing conditions" language, rather than correcting a scrivener's error to reform the contract to read "market conditions," CleanChoice still breached the contract's terms. As shown above, *see supra* ¶¶ 55–59, CleanChoice's charges were higher compared to other ARES. These other ARES are

faced with the same marketing conditions as CleanChoice, as well as the same supply costs. The disconnect between CleanChoice's and other ARES's rates therefore establishes that CleanChoice did not set its prices based on "market conditions" or "marketing conditions."

82. While CleanChoice's actual costs related to "marketing conditions" are not public, two additional pre-discovery benchmarks establish that any costs attributable to "marketing conditions" could not explain CleanChoice's exorbitant rates or render them compliant with the contract.

83. First, a 2024 survey of "energy and utility" companies indicated that companies in this sector spend between 3–8% of their revenue on marketing.[9] Even assuming 8%, the high end of this range, that would mean that CleanChoice spent around $1,397,288 on marketing in Illinois in 2024 (CleanChoice's revenue in Illinois according to the EIA data multiplied by 8%). Because CleanChoice sold 147,905,000 kWh in Illinois in 2024 according to EIA data, that means that CleanChoice spent less than one penny (0.94 cents) per kWh on marketing in Illinois for the year for which we have Plaintiff's billing data. This less-than-one-cent per kWh expense does not render its price gouging compliant with the contract.

84. As a cross-check, a financial consulting firm estimated that ARES spend between $75 and $150 per customer on acquisition costs.[10] This generates a similar figure to the study referenced above. CleanChoice had 24,315 customers in 2024 in Illinois. Obviously, not all of those customers were acquired in 2024. Indeed, Plaintiff enrolled long before 2024. Yet even assuming that every CleanChoice customer in 2024 was acquired in 2024, and using the high-end

---

[9] Stephan, Abbey, *How to Plan a Marketing Budget for Energy and Utilities Companies*, WEBFX (Dec. 10, 2024), https://www.webfx.com/blog/home-services/energy-and-utilities-marketing-budget/.

[10] Lutton, Josh and Drummond, Lain, *Electrical Potential: Reducing Customer Acquisition Cost and Increasing Lifetime Value in Solar and Competitive Electricity*, WOODLAWN ASSOCIATES (Feb. 28, 2013), https://woodlawnassociates.com/electrical-potential-solar-and-competitive-electricity/.

$150 per customer figure, that would mean CleanChoice spent approximately 2.5 cents per kWh on customer acquisition ($150 multiplied by the number of Illinois CleanChoice customers in 2024 divided by the amount of electricity CleanChoice sold in 2024 in Illinois). This minimal cost (which very likely overestimates CleanChoice's actual costs given the very conservative assumptions) likewise does not render its exorbitant rates compliant with the contract.

85. To the extent the Court adopts the "marketing conditions" language, Plaintiff will be able to establish CleanChoice's precise marketing costs to create a damages model on a per kWh basis based on information obtained in discovery. Pre-discovery, these three benchmarks (other ARES's rates, the survey data of marketing costs as a percentage of revenue, and the dollar per customer acquisition costs) plausibly demonstrate that CleanChoice's "marketing conditions" cannot justify its rates and that CleanChoice therefore breached its contract.

86. Defendant's ability to make a profit does not justify its outrageously high rates. A reasonable consumer might understand that an ARES will attempt to make a reasonable profit by selling consumers retail electricity. However, such a consumer would also expect that such profits would be consistent with profit margins obtained by other suppliers of electricity in their respective markets and that Defendant's profiteering at the expense of its customers would not be so extreme that its rate bears no relation to a rate based on costs but is instead outrageously higher.

87. As demonstrated by the analysis of EIA data, CleanChoice's rates are substantially higher than other ARES, even though those other ARES incur the same costs and have similar profit motives. *See supra* ¶¶ 55–59.

88. In this case, CleanChoice knew that once it had acquired the consumer's energy account, it could charge high energy rates and many consumers (if not most) would not know, and simply pay the exorbitant charges, month after month.

89. It is well-established that defaults are powerful drivers of consumer behavior. There are various factors underlying this human tendency that have been discussed in the judgment and decision-making literature, such as the work about defaults, the "status quo bias,"[11] and "Nudges."[12]

90. The fact that CleanChoice charges fixed rates (which also include RECs) that are substantially lower than its variable rates also proves that the costs, expenses, and margins CleanChoice incurs cannot justify its exorbitant variable rates. CleanChoice's fixed rates are always substantially lower than its variable rates; after all, that is how CleanChoice attracts customers in the first place. CleanChoice incurs the same costs, expenses, and margins to supply its fixed rate customers as it incurs for its variable rate customers.

91. Defendant's exploitation of consumer inertia is further exacerbated by the fact that it is unlikely that consumers will compare CleanChoice's prices with what their local utility is charging, or that they will understand the differences in the two companies' charges so as to make the comparison effective. As the Illinois Attorney General has observed, ARES marketing practices like that deployed by CleanChoice "deprive consumers of sufficient information to evaluate the ARES offers and consumers end up paying charges that grossly exceed market prices and the utility default price."[13]

---

[11] Daniel Kahneman, Jack L. Knetsch and Richard H. Thaler (1991), "Endowment Effect, Loss Aversion, and Status Quo Bias," *The Journal of Economic Perspectives*, Vol. 5, pp. 193–206.

[12] R. Thaler and S. Sunstein (2008), *Nudge*, Yale University Press.

[13] Case 18-1623, Order on Petition for Declaratory Ruling, at 14 (Dec. 4, 2018), https://icc.illinois.gov/docket/P2018-1623/documents/280162/files/488971.pdf.

## IV. CleanChoice Violated Illinois Alternative Retail Electric Supplier Selection Law

92. Because of the Illinois Legislature's concerns with skyrocketing variable rates, Illinois adopted the Alternative Retail Electric Supplier Selection law as part of the Illinois Consumer Fraud and Deceptive Business Practices Act. 815 ILCS § 505/2EE, which requires that "[t]he terms, conditions, and nature of the service to be provided to the subscriber must be clearly and conspicuously disclosed, in writing, and an electric service provider must directly establish the rates for the service contracted for by the subscriber"

93. Through its conduct, CleanChoice violated both the spirit and letter of 815 ILCS § 505/2EE, the law that is explicitly drafted to allow energy consumers to "shop for alternatives to the rates demanded by" utilities and provide Illinois consumers with "attractive prices" to "benefit[] all Illinois consumers." 220 ILCS 5/20-102.

94. CleanChoice's Terms and Conditions included in its mailer never clearly and conspicuously disclose, and CleanChoice never directly established, the variable rate. Reasonable consumers would not understand how CleanChoice's variable supply rate is established from the pricing term, which states "you will be charged a variable supply rate that is subject to change based on different factors which may include the cost for us to purchase renewable energy certificates (RECs), applicable state and local taxes, generation and transmission charges, and other market[] conditions." Moreover, this disclosure is not clear and conspicuous.

95. Moreover, Illinois law requires that ARES "clearly and conspicuously disclose all associated costs for [electricity] services." 815 ILCS § 505/2GG. Illinois regulations likewise require that ARES provide customers with "an explanation of how the variable charges are determined." Ill. Admin. Code 83 § 412.110(c)(1). CleanChoice's lack of transparency violates that straightforward requirement.

96. CleanChoice's Terms and Conditions contain a 10-day rescissionary period, during which a customer can rescind their agreement with Cleanchoice before it becomes effective. The Terms and Conditions therefore function as marketing material during the rescissionary period.

97. The Terms and Conditions do not clearly and conspicuously disclose all associated costs or provide an explanation of how the variable charges are determined. Instead, CleanChoice relies on opacity to charge whatever it thinks it can extract from a customer before that customer cancels.

98. CleanChoice could have provided a formula that lay customers could understand, but instead used jargon to obfuscate its price gouging.

**V. CleanChoice's Documented History Of CleanChoice's Deceptive Business Practices**

99. CleanChoice has a long record of using deceptive marketing and sales practices, which a 2022 investigative report describes as "a disturbing pattern of behavior" built upon "a fundamentally misleading for-profit business model that capitalizes on a lack of popular understanding about how electrical grids operate."[14]

100. In 2023, CleanChoice paid $600,000 in a settlement[15] with the staff of the Illinois Commerce Commission and two consumer advocacy organizations that alleged that "CleanChoice asks customers to pay a premium for grid power matched with Renewable Energy Credits (RECs), but fails to provide critical information, such as what type of RECs are being offered, where the

[14] William Bredderman, *Critics Say CleanChoice Energy, Founded By Political Operatives, Targets Eco-Conscious Consumers With Misleading Promotions*, The Daily Beast, Mar. 29, 2022, *available at* https://www.thedailybeast.com/cleanchoice-energy-is-the-sneaky-green-energy-company-that-pisses-off-climate-do-gooders (last visited April 9, 2026).

[15] Settlement Agreement, *Environ. Law & Policy Cen. v. CleanChoice Energy, Inc.*, No. 20-0499 (Illinois Commerce Commission Feb. 21, 2023), *available at* https://www.icc.illinois.gov/docket/P2020-0499/docket-sheet (last visited April 9, 2026).

RECs were generated, and the 'price to compare' (the default utility's current supply price). Without this information, customers cannot evaluate the costs and benefits of these offers."[16]

101. In 2016, CleanChoice (then operating under the name "Ethical Electric")[17] entered into an Assurance of Voluntary Compliance ("AVC") with the Illinois Attorney General in a matter that alleged that CleanChoice improperly marketed its electricity as "green" when it was really just supplying "brown" energy paired with the use of RECs as offsets, and that it claimed its price was comparable to the local utility when it was routinely more than 5 percent higher.[18] Specifically, the Illinois Attorney General's action stemmed from CleanChoice's direct mail solicitations promoting its "Clean Energy Option" product as powering customers' homes with electricity generated exclusively from renewable energy sources like wind and solar. In truth, however, the electricity provided was simply electricity from the electric grid that was then paired with RECs. As part of the AVC, CleanChoice agreed to make $3 million available to customers.[19]

102. Additionally, just last year, the Massachusetts Department of Public Utilities ("DPU") issued a Notice of Probable Violation ("NOPV")[20] detailing multiple CleanChoice deceptive practices and outlining numerous violations of the DPU's own regulations as well as

---

[16] Verified Formal Complaint at 2, *Environ. Law & Policy Cen. v. CleanChoice Energy, Inc.*, No. 20-0499 (Ill. Comm. Comm'n May 29, 2020), *available at* https://www.icc.illinois.gov/docket/P2020-0499/docket-sheet (last visited April 9, 2026).

[17] Press Release, *Ethical Electric Is Now CleanChoice Energy*, Oct. 31, 2016, *available at* https://cleanchoiceenergy.com/news/cleanchoice_energy_announcement (last visited April 9, 2026).

[18] Walton, Robert, *Illinois Attorney General Reaches Settlement With "Green" Energy Supplier*, UTILITYDIVE (Aug. 18, 2016), *available at* https://www.utilitydive.com/news/illinois-attorney-general-reaches-settlement-with-green-energy-supplier/424700/ (last visited April 9, 2026).

[19] *Id.*

[20] Mass. Dep't of Pub. Utils., *CleanChoice Energy, Inc., Notice of Probable Violation*, D.P.U. 25-138 (Sept. 15, 2025), *available at* https://fileservice.eea.comacloud.net/V3.1.0/FileService.Api/file//aefgicigj?DBQIQUxUjvHmptOWDiQXpGsLVPSl7NdqNUTTiLCXtaiPcSxI+blU344Khxm+qpOeg0hKFj9M9l/xQR8+/8GqPvdGgrFe6XR6ngIfa80wd3rxFD8G4j981M2Rna9aVTXA.

regulations issued by the Massachusetts Attorney General. In evaluating CleanChoice's contractual promise to provide variable rates that are "based on market conditions and CleanChoice Energy's costs to provide energy supply service," the DPU found that "CleanChoice's contract summary form, and contract, conflicted with CleanChoice's actual business practice of raising prices regardless of market conditions and its energy costs" and that accordingly "CleanChoice's contract summary forms and contract were inaccurate and deceptive."[21] The DPU found that CleanChoice engaged in "Deceptive Pricing Practices," as its pricing conflicted with its contractual obligation to charge a variable rate based on market conditions and CleanChoice's costs to provide energy supply service.[22] The DPU noted that CleanChoice "offers electricity supply products that have a three-month fixed introductory price, which then renews to a variable monthly price if the customer does not cancel service or choose a new product." The DPU in its NOPV identified "problematic business practices that CleanChoice employed in marketing electric supply service" which together constituted "egregious misconduct and a pattern of misconduct."[23]

103. CleanChoice's practices have also caught the attention of other state and local officials over the years. For example, in 2017, the Town of Acton, Massachusetts alerted the Massachusetts Department of Public Utilities that CleanChoice was running "a misleading marketing campaign," by sending advertisements to residents and "creating the impression that it is a government communication."[24]

---

[21] *Id.* at 14.

[22] *Id.* at 13-15.

[23] *Id.*

[24] Letter to Mass. Dep't of Pub. Utils., Aug. 4, 2017, *available at* https://www.actonma.gov/DocumentCenter/View/3921/Letter-of-Complaint---Mass-Dept-Public-Utilities?bidId= (last visited April 9, 2026).

104. And in 2015, CleanChoice (again operating under the "Ethical Electric" name) entered into an Assurance of Voluntary Compliance with the Pennsylvania Attorney General for misleading customers into thinking its advertisements were from the local utility, rather than from an ARES.[25] The AVC required CleanChoice to cease its misleading advertising practices.[26]

105. The complaint statistics for CleanChoice tell a similar story. The ICC publishes complaint scorecards through its Plug In Illinois portal,[27] which tracks the complaint rate for each ARES operating in Illinois and compares it to the statewide market average using a five-tier methodology. In five of the six scorecards currently published — covering rolling six-month periods from July 2024 through May 2025 — CleanChoice received a rating of "Higher Than Average Rate of Complaints." Specifically, CleanChoice ranked 38th of 50 ARES (July–December 2024); 41st of 50 ARES (August 2024–January 2025); 42nd of 50 ARES (September 2024–February 2025); 38th of 50 ARES (October 2024–March 2025); 35th of 50 ARES (November 2024–April 2025); and 34th of 49 ARES (December 2024–May 2025). Across the full range of available scorecards, the ICC has consistently identified CleanChoice as generating above-average complaint rates among Illinois ARES—a pattern consistent with CleanChoice's deceptive practices.

## TOLLING OF STATUTE OF LIMITATIONS

106. Given that Defendant has engaged in a series of deceptive acts and omissions for which it billed consumers and consumers continued to pay, the continuing violation doctrine applies, effectively tolling the limitations period until the date of CleanChoice's last wrongful act

---

[25] Myles Snyder, *AG: Ethical Electric Misled Consumers*, ABC27, June 11, 2015, *available at* https://www.abc27.com/news/ag-ethical-electric-misled-consumers/ (last visited April 9, 2026).

[26] *Id.*

[27] Plug In Illinois, *Customer Complaint Statistics*, https://plugin.illinois.gov/consumer-protections/customer-complaint-statistics.html (last visited April 9, 2026).

against Plaintiff, which was in November 2025, when CleanChoice last charged Plaintiff Davies substantially more for electricity than the local utility.

107. Plaintiff's claims are timely under the discovery rule. Plaintiff did not discover, and could not have discovered through the exercise of reasonable diligence, that CleanChoice was charging rates substantially in excess of the market supply cost or market rates charged by other ARES until shortly before the filing of this Complaint. CleanChoice's monthly bills disclosed only the per-kWh rate charged to Plaintiff—they did not disclose CleanChoice's actual supply costs, the rates charged by competing ARES, or the relationship between CleanChoice's rates and market conditions. A reasonable residential electricity consumer receiving such bills has no basis to know, and no practical means of determining, that CleanChoice breached the Terms and Conditions by charging a variable rate inconsistent with market supply costs, and substantially higher than that of the local utility or other ARES. The statute of limitations therefore did not begin to run until Plaintiff discovered, or reasonably should have discovered, the facts giving rise to these claims.

## **CLASS ALLEGATIONS**

108. Plaintiff also brings this action on his own behalf and additionally, pursuant to Rule 23(b)(2) and (b)(3) of the Federal Rules of Civil Procedure, on behalf of a class of all Illinois CleanChoice customers who were charged for electricity services by CleanChoice from the earliest allowable date through the date of judgment (the "Class").

109. As alleged throughout this Complaint, the Class claims all derive directly from a single course of conduct by Defendant. Defendant has engaged in uniform and standardized conduct toward the Class—its marketing and billing practices—and this case is about the responsibility of Defendant for its knowledge and conduct in deceiving its customers. This conduct did not meaningfully differentiate among individual Class members in its degree of care or candor, its actions or inactions, or its omissions. Upon information and belief, the variable rate provisions

in the customer agreements for all of CleanChoice's Illinois customers (the "Class Members") are materially the same.

110. Excluded from the Class are Defendant; any parent, subsidiary, or affiliate of Defendant; any entity in which Defendant has or had a controlling interest, or which Defendant otherwise controls or controlled; and any officer, director, employee, legal representative, predecessor, successor, or assignee of Defendant.

111. Plaintiff reserves the right, as might be necessary or appropriate, to modify or amend the definition of the Class and/or add additional Subclasses, when Plaintiff files his motion for class certification.

112. Plaintiff does not know the exact size of the Class since such information is in the exclusive control of CleanChoice. Plaintiff believes, however, that based on the publicly available data concerning Defendant's customers in the United States, the Class encompasses at least tens of thousands of individuals whose identities can be readily ascertained from Defendant's records. Accordingly, the members of the Class are so numerous that joinder of all such persons is impracticable.

113. The Class is ascertainable because its members can be readily identified using data and information kept by Defendant in the usual course of business and within its control. Plaintiff anticipates providing appropriate notice to each Class Member in compliance with all applicable federal rules.

114. Plaintiff is an adequate class representative. His claims are typical of the claims of the Class and do not conflict with the interests of any other members of the Class. Plaintiff and the other members of the Class were subject to the same or similar conduct engineered by the

Defendant. Further, Plaintiff and members of the Class sustained substantially the same injuries and damages arising out of Defendant's conduct.

115. Plaintiff will fairly and adequately protect the interests of all Class Members. Plaintiff has retained competent and experienced class action attorneys to represent his interests and those of the Class.

116. Questions of law and fact are common to the Class and predominate over any questions affecting only individual Class Members, and a class action will generate common answers to the questions below, which are apt to drive the resolution of this action:

a. Whether Defendant's misrepresentations and omissions are materially misleading;

b. Whether Defendant breached its contract with Plaintiff and Class Members by failing to set variable rates in the method dictated by the parties' contract;

c. Whether Defendant's conduct violates various state consumer protection statutes;

d. Whether Defendant violated the duty of good faith and fair dealing in its consumer contracts;

e. Whether Class Members have been injured by Defendant's conduct; and

f. The extent of class-wide injury and the measure of damages for those injuries.

117. A class action is necessary because (i) the prosecution of separate actions by Class Members will create a risk of adjudications with respect to individual Class Members that will, as a practical matter, be dispositive of the interests of the other Class Members not parties to this action, or substantially impair or impede their ability to protect their interests; and (ii) the prosecution of separate actions by Class Members will create a risk of inconsistent or varying adjudications with respect to individual Class Members, which will establish incompatible standards for Defendant's conduct.

118. A class action is appropriate because Defendant has acted or refused to act on grounds generally applicable to all Class Members.

119. A class action is superior to all other available methods for resolving this controversy because questions of law and fact common to the Class predominate over any questions affecting only individual Class Members and a class action will fairly and efficiently adjudicate the controversy.

120. Accordingly, this action satisfies the requirements set forth under Federal Rule of Civil Procedure 23(a) and 23(b).

## CAUSES OF ACTION

### COUNT I
***Breach of Contract***
***(On Behalf of the Class)***

121. Plaintiff realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

122. CleanChoice customers have customer agreements whose variable rate terms are substantially similar.

123. Plaintiff and the Class entered into valid contracts with Defendant for the provision of electricity.

124. CleanChoice uniformly represents to its Illinois customers that its variable rates for electricity are "subject to change based on different factors which may include the cost for us to purchase renewable energy certificates (RECs), applicable state and local taxes, generation and transmission charges, and other marketing conditions."

125. Upon information and belief, Plaintiff was subject to the same contractual terms for his variable rate for electricity as the other customers in Illinois.

126. While the contract contains the phrase "marketing conditions," which may be a scrivener's error that intended to say "market conditions," CleanChoice breached the pricing provision regardless of whether the Court construes the term as "market conditions" or as "marketing conditions."

127. Pursuant to the contracts, Plaintiff and the Class paid the variable rates Defendant charged for electricity.

128. However, Defendant failed to perform its obligations under its contracts to charge rates based upon the costs and factors identified in the contract. Instead, Defendant charged variable rates for electricity that were untethered from the factors upon which the parties agreed the rate would be based.

129. Plaintiff and the Class were damaged as a result because they were billed, and they paid, a charge for electricity that was higher than it would have been had Defendant based its rate on the costs and factors identified in the contract.

130. By reason of the foregoing, Defendant is liable to Plaintiff and other Class Members for the damages that they have suffered as a result of Defendant's actions, the amount of such damages to be determined at trial, plus attorneys' fees.

131. Additionally, if there is any ambiguity in how any of the terms in the contract are to be applied, every contract contains an implied covenant of a duty of good faith and fair dealing in the performance and enforcement of the contract. This duty applies with particular force here, where CleanChoice's contracts are adhesion contracts containing terms not readily discernible to a layperson—including undefined terms such as "transmission charges"—and where CleanChoice, as the sole drafter, bore responsibility for the precision of the language it chose.

132. CleanChoice was thus required to perform the contract's pricing obligations in a manner consistent with what the parties, acting reasonably and in good faith, must be presumed to have intended. CleanChoice's actual conduct was irreconcilable with any such reasonable, good-faith understanding of the contract terms. CleanChoice has at all times known (i) that its variable supply rates were consistently and significantly higher than any reasonable application of the contractual pricing formula would permit; (ii) that customers lacked ready access to information about CleanChoice's actual costs or the expertise to identify the discrepancy between the promised formula and the rates actually charged, and that CleanChoice exploited this information asymmetry to charge excess rates with impunity; (iii) that customers paying CleanChoice's energy rates receive no material added benefit in exchange for paying energy rates that are dramatically higher than the local utility's rates as compared to purchasing electricity and RECs from any other entity; and (iv) that CleanChoice could, but failed to, provide customers with adequate advance notice of the rates it would charge. Despite this superior knowledge, CleanChoice acted with a bad motive and continued to gouge consumers.

133. CleanChoice's failure to disclose this material information is what permitted CleanChoice to charge Plaintiff and Class Members excessive rates—unburdened by disclosing the truth about its rate setting practices—and Plaintiff experienced the adverse consequences in the performance of the parties' agreement.

134. Plaintiff and Class Members also reasonably expected that CleanChoice would not exploit its position as the sole drafter of an adhesion contract to impose charges dramatically in excess of any reasonable construction of the agreed-upon pricing formula. Without these reasonable expectations, Plaintiff and other Class Members would not have agreed to buy energy from Defendant.

135. CleanChoice violated the covenant of good faith and fair dealing by performing the contract in a manner that frustrated Plaintiff's and other Class Members' reasonable expectations under the pricing terms.

136. As a result of CleanChoice's breach of contract and, to the extent any pricing term is found ambiguous, its failure to perform it in accordance with the duty of good faith and fair dealing, CleanChoice is liable to Plaintiff and other Class Members for actual damages in an amount to be determined at trial.

**COUNT II**
***Violations of Illinois Consumer Fraud and Deceptive Practices Act, 815 ILCS § 505/1 et seq.***
***(On Behalf of the Class)***

137. Plaintiff realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

138. Defendant's violations of the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1 et seq., (ICFA) are applicable to all Class Members, respectively, and Plaintiff is entitled to damages from Defendant's illegal and deceptive conduct.

139. ICFA prohibits a "supplier" from committing:

> Unfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact, . . . in the conduct of any trade or commerce are hereby declared unlawful whether any person has in fact been misled, deceived or damaged thereby.

815 ILCS § 505/2.

140. Defendant intentionally deceived Plaintiff and the Class by affirmatively misrepresenting that it would charge a rate "based on different factors which may include the cost for us to purchase renewable energy certificates (RECs), applicable state and local taxes,

generation and transmission charges, and other market[] conditions." This affirmative misrepresentation constitutes an unfair or deceptive act or practice in the conduct of CleanChoice's trade.

141. While the contract contains the phrase "marketing conditions," which may be a scrivener's error that intended to say "market conditions," CleanChoice violated the ICFA regardless of whether the Court construes the term as "market conditions" or as "marketing conditions."

142. Moreover, an ARES must "clearly and conspicuously disclose[]" the "terms, conditions, and nature of the service to be provided to the customer." 815 ILCS § 505/2EE(a)(v)(A)(5)(iii).

143. Additionally, an ARES must list rates that "shall clearly and conspicuously disclose all associated costs for such service[.]" 815 ILCS § 505/2GG. Illinois regulations likewise require that ARES provide customers with "an explanation of how the variable charges are determined." Ill. Admin. Code 83 § 412.110(c)(1).

144. Because the Terms and Conditions contain a 10-day rescissionary period, they function as marketing material until the contract becomes effective.

145. CleanChoice failed to clearly and conspicuously disclose a customer's costs and failed to explain how the variable charges are determined. It instead relied on jargon to hide its price gouging.

146. CleanChoice made misrepresentations and omissions of material facts with respect to the rates charged for electricity, which constitute unfair and deceptive practices under the ICFA, including:

a. that its variable energy rates are consistently and significantly higher than the rates charged by the customer's existing utility;

b. that customers paying Defendant's variable energy rates receive no material added benefit in exchange for paying energy rates that are dramatically higher than the local utility's rates, other than the minimal cost of additional RECs;

c. the true methodology Defendant used to calculate its rates;

d. that "the biggest factor determining the size of [customers'] bill is the amount of electricity they use" and "usage is almost always the biggest factor influencing electricity bills" without mentioning that CleanChoice's rates may be the biggest factor influencing a customer's bill;

e. the conditions that must be present for a variable rate customer to save money compared to what the consumer's local utility would have charged; and

f. its costs to purchase RECs are minimal compared to its electricity procurement costs and that REC costs do not justify Defendant charging rates that are dramatically higher than the local utility's rates.

147. Each of the misrepresentations and omissions above constitutes an unfair and deceptive act or practice in connection with CleanChoice's trade and thus violates the ICFA.

148. This misrepresented and omitted information would have been material to any potential customer, as was the false information CleanChoice affirmatively conveyed.

149. In addition, 815 ILCS § 505/2EE requires that "The terms, conditions, and nature of the service to be provided to the subscriber must be clearly and conspicuously disclosed, in writing, and an electric service provider must directly establish the rates for the service contracted for by the subscriber."

150. CleanChoice failed to "clearly and conspicuously" disclose the rate for its variable supply and to "directly establish" the rates for its variable supply in its Terms and Conditions included with the mailer in violation of 815 ILCS § 505/2EE, which constitutes an unfair and deceptive act or practice under 815 ILCS § 505/2.

151. Defendant's price gouging scheme, which often affects Illinois's most vulnerable citizens, is unfair, immoral, unethical, oppressive, and unscrupulous. Victims of CleanChoice's

scheme cannot avoid it; once CleanChoice has charged its exorbitant rate, customers can only pay the amount charged or risk having their electricity shut off. This can be a life-threatening issue in the depths of the summer and winter. Moreover, Illinois's customers are not informed that CleanChoice is price gouging them, and reasonable customers reasonably trust that the ARES providing them service will not charge a rate divorced from supply costs about which they are not, as private individuals, ordinarily privy.

152. CleanChoice's price gouging causes customers significant and substantial pecuniary injury.

153. Plaintiff and other Class Members entered into agreements to purchase electricity from Defendant and suffered ascertainable loss as a direct and proximate result of Defendant's actions in violation of the ICFA.

154. As a consequence of Defendant's wrongful actions, Plaintiff and the other Class Members suffered an ascertainable monetary loss based on the difference in the prices and charges they paid versus the prices and charges they would have paid had Defendant imposed prices and charges based on the contract formula or had they not switched to Defendant from their previous supplier.

155. Plaintiff and other Class Members suffered an ascertainable loss caused by Defendant's misrepresentations and omissions because they would not have entered into an agreement to purchase electricity from Defendant if the true facts concerning its prices and charges had been known.

156. By reason of the foregoing, Defendant is liable to Plaintiff and Class Members for compensatory damages; punitive damages; attorneys' fees; and the costs of this suit.

157. Defendant knows full well that its prices and charges are unconscionably high, and the misrepresentations it makes with regard to the prices and charges being based on "the cost for us to purchase renewable energy certificates (RECs), applicable state and local taxes, generation and transmission charges, and other market[] conditions" were made for the sole purpose of inducing consumers to purchase electricity from it so it can reap outrageous profits to the direct detriment of Illinois consumers and without regard to the consequences high utility bills cause such consumers. Defendant's conduct was intentional, wanton, willful, malicious, and in blatant disregard of, or grossly negligent and reckless with respect to, the life, health, safety, and well-being of Plaintiff and the other Class Members. Defendant is therefore additionally liable for punitive damages, in an amount to be determined at trial.

**COUNT III**
***Unjust Enrichment***
***(On Behalf Of The Class)***

158. Plaintiff realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

159. This cause of action is pleaded in the alternative to Plaintiff's contract claims. To the extent the Court determines that a valid contract exists between the parties, Plaintiff does not intend to proceed with his unjust enrichment claim.

160. Plaintiff and the Class Members conferred a tangible economic benefit upon CleanChoice by contracting with CleanChoice for electricity or natural gas. Plaintiff and the Class would not have contracted with CleanChoice for electricity had they known that CleanChoice would abuse its discretion and the information asymmetry to charge rates substantially in excess of competing rates available on the market.

161. Plaintiff and the Class Members would not have purchased energy from CleanChoice had they known the truth about CleanChoice's energy prices and charges.

162. By engaging in the conduct described above, CleanChoice has unjustly enriched itself and received a benefit beyond what was contemplated by the parties at the expense of Plaintiff and Class Members.

163. While the contract contains the phrase "marketing conditions," which may be a scrivener's error that intended to say "market conditions," CleanChoice was unjustly enriched regardless of whether the Court construes the term as "market conditions" or as "marketing conditions."

164. It would be unjust and inequitable for CleanChoice to retain the payments Plaintiff and Class Members made for excessive energy prices and charges.

165. Therefore, CleanChoice is liable to Plaintiff and Class Members for the damages that they have suffered as a result of CleanChoice's actions.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court:

a) Issue an order certifying the Class defined above, appointing the Plaintiff as Class Representative, and designating the undersigned firms as Class Counsel;

b) Issue an order reforming the Terms and Conditions to read "market conditions" instead of "marketing conditions";

c) Find and declare that Defendant has breached its contracts with the Class;

d) Render an award of compensatory damages, the precise amount of which is to be determined at trial;

e) Issue an injunction or other appropriate equitable relief requiring Defendant to refrain from engaging in the deceptive practices alleged herein;

f) Render an award of punitive damages or other statutory, treble, exemplary or other damages;

g) Enter judgment including interest, costs, reasonable attorneys' fees, and expenses; and

h) Grant all such other relief as the Court deems appropriate.

## JURY DEMAND

Under Federal Rule of Civil Procedure 38, Plaintiff demands that a jury determine any issue triable of right.

Dated: April 9, 2026

Respectfully submitted,

**WITTELS MCINTURFF PALIKOVIC**

/s/ Daniel J. Kieselstein
Daniel J. Kieselstein
305 BROADWAY, 7TH FLOOR
NEW YORK, NEW YORK 10007
Tel: (914) 775-8862
djk@wittelslaw.com

**FINKELSTEIN, BLANKINSHIP,**
**FREI-PEARSON & GARBER, LLP**

D. Greg Blankinship*
One North Broadway, Suite 900
White Plains, New York 10601
Telephone: (914) 298-3281
gblankinship@fbfglaw.com

** Pro hac vice application forthcoming*

*Counsel for Plaintiff and the Proposed Class*